UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF LOUISIANA

JERRY H. LANDRUM

VERSUS

COSCO (aka COSCO HOME AND
OFFICE FURNITURE, a division of
Dorel Industries)

CIVIL ACTION

NO. 11-424-JJB

**RULING ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

This matter is before the Court on Defendant Dorel Juvenile Group, Inc.'s ("DJG") (improperly pled as Cosco) motion for summary judgment. (Doc. 23). Plaintiff Jerry H. Landrum ("Landrum") has filed an opposition (Doc. 25), to which DJG has filed a reply (Doc. 28). Landrum has also filed a supplemental opposition, (Doc. 31), to which DJG filed a reply. (Doc. 34) Oral argument is not necessary. The Court's jurisdiction exists pursuant to 28 U.S.C. § 1332. For the reasons herein, the Court GRANTS in part and DENIES in part. (Doc. 23).

I.

Landrum filed this product liability action against DJG, alleging that a folding chair manufactured by DJG was defective in both construction and design, and that these defects caused Landrum to fall and sustain injuries. (Doc. 15). DJG filed a motion for summary judgment, arguing that Landrum has no evidence to support either a manufacturing defect or a design defect claim. (Doc. 23). Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact." Fed. R. Civ. P. 56(a). The movant, or party seeking summary judgment, bears the burden of

1

showing "that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).

II.

The Louisiana Product Liability Act ("LPLA") provides that a manufacturer is liable "for damage proximately caused by a characteristic of the product that renders the product unreasonably dangerous when such damage arose from a reasonably anticipated use of the product by the claimant or another person or entity." La. Rev. Stat. Ann. § 9:2800.54(B). Under the LPLA, a product is unreasonably dangerous if it is (1) "unreasonably dangerous in construction or composition," (2) "unreasonably dangerous in design," (3) "unreasonably dangerous because an adequate warning about the product has not been provided," or (4) "unreasonably dangerous because it does not conform to an express warranty of the manufacturer." La. Rev. Stat. Ann. § 9:2800.54(B). Landrum's petition only alleges claims for construction and design defects, although DJG argues in a footnote that even if Landrum had alleged claims for failure to warn and/or failure to conform to an express warranty, there is an absence of evidence to support either of these claims. (Doc. 23).

Under the LPLA, a product has a construction defect "if, at the time the product left its manufacturer's control, the product deviated in a material way from the manufacturer's specifications or performance standards for the product or from otherwise identical products manufactured by the same manufacturer." La. Rev. Stat. Ann. § 9:2800.55. DJG argues that Landrum has failed to show any evidence that the chair deviated from DJG's specifications or performance standards. Claude R. Mount ("Mount"), Landrum's expert, noted in his report that there "was no observable

difference between the exemplar [chair] and the chair that failed." (Doc. 23-5 at 3). In his deposition, Mount stated that the "accident chair and the exemplar chair appear to be so similar that the accident chair wasn't a one-off or it was bad and all the rest of them were good." (Doc. 23-4 at 106). Mount further stated that "there were consistent problems in how the chairs were manufactured that were demonstrated by at least two chairs out of the production lot of the manufacturer." (*Id.*). Additionally, Mount stated that he did not receive any documents from DJG and thus he did not know what type of testing DJG performed on their chairs or what DJG's quality requirements were for that model. Thus, DJG argues that Landrum has not shown any evidence that the chair deviated from DJG's standards or that the chair deviated from other chairs and it is entitled to summary judgment.

In his opposition, Landrum argues that while Mount did not find that the chair deviated from the other chairs, Mount noted in his report that the "[a]ttachment welds for the spacer rods were of the same poor quality and irregular size." (Doc. 23-5 at 3). Landrum argues that the poor welding was not due to a defect in design but a "defect in the manufacturing process at large." (Doc. 25 at 6). Landrum asserts that the welds "fell below industry performance standards and were therefore defective." (*Id.*).

In response, DJG points out that Landrum's argument that the poor welding was due to a manufacturing defect at large is legally baseless. As the United States Court of Appeals for the Fifth Circuit stated, "[t]he 'unreasonably dangerous in construction or composition' provision of the LPLA provides a remedy for damages caused by a product that is defective due to a mistake in the manufacturing process." *Stahl v. Novartis Pharmaceuticals Corp.*, 283 F.3d 254, 262-63 (5th Cir. 2002). DJG argues that Landrum

3

has not shown any evidence that would support a construction, or manufacturing, defect claim, and thus, summary judgment should be granted.

In Landrum's supplemental opposition, Landrum focuses on the language in the statute, which provides that a manufacturing defect may be proven by showing that the product deviated from the "performance standards for the product." (Doc. 31 at 5). Landrum argues that while Mount did not find that the chair deviated from other identical chairs, Mount suggested that the welding was poor and below industry standards. Landrum asserts that if the manufacturing process itself is flawed, or below industry standards, then this constitutes a manufacturing defect.

The Court finds that Landrum has not produced any evidence to support a claim for a manufacturing defect. The plain language of the statute requires showing that "the product deviated in a material way from the manufacturer's specifications or performance standards for the product or from otherwise identical products manufactured by the same manufacturer." La. Rev. Stat. Ann. § 9:2800.55. Landrum is unable to show that the chair at issue deviated from "otherwise identical products," as admitted by Landrum's expert. Landrum also is unable to show that the chair deviated from DJG's specifications or performance standards because Landrum's expert did not receive or review DJG's performance standards.

Additionally, Landrum's argument that the manufacturing process as a whole is flawed is misplaced. As DJG correctly pointed out, a manufacturing or construction defect is "due to a mistake in the manufacturing process." *Stahl*, 283 F.2d at 263. Without showing some evidence that the manufacturing process deviated from DJG's standards, Landrum cannot show that there is a genuine issue of material fact. Thus,

the Court will grant summary judgment in favor of the defendant on the claim of a manufacturing defect.

Landrum also claims that that the chair was unreasonably dangerous in design. Under the LPLA:

> A product is unreasonably dangerous in design if, at the time the product left its manufacturer's control:
>
> (1) There existed an alternative design for the product that was capable of preventing the claimant's damage; and
>
> (2) The likelihood that the product's design would cause the claimant's damage and the gravity of that damage outweighed the burden on the manufacturer of adopting such alternative design and the adverse effect, if any, of such alternative design on the utility of the product.

La. Rev. Stat. Ann. § 9:2800.56. To survive a motion for summary judgment, Landrum must show that "safer alternative designs were in existence at the time [the chair left DJG's control] and that the risk avoided by such designs outweighed the burden of adopting the designs." *Morgan v. Gaylord Container Corp.*, 30 F.3d 586, 590 (5th Cir. 1994). DJG argues that Landrum has not met his burden, and thus, it is entitled to summary judgment.

DJG first argues that Landrum failed to show that there was an alternative feasible design available. It is undisputed that the chair at issue was designed to have a saddle plug, or tip, for both of the rear legs. (Doc. 23-2 and Doc. 23-5 at 2). According to Mount's expert report, a saddle plug "serves as a cushion between the front and rear leg . . . and prevents metal-to-metal wear." (Doc. 23-5 at 2). The report further explains that DJG's saddle "is intended to maintain alignment of the rear chair legs . . . [and the saddle] has a groove to receive the front leg tube and guide its position relative to the

5

rear leg tube." (*Id.*). Mount noted that the "remaining saddle plug could be turned by hand" and there was "no crimp, pin, or dimple in the leg to retain the saddle plug once inserted." (*Id.*). Moreover, "there was no residue of adhesive that might have held the [missing saddle plug] in place." (*Id.*). DJG argues that while Mount suggests alternative considerations for attaching the saddle tip, such as using a crimp or pin, Mount does not show a particular alternative design that incorporates these proposed features.

In his deposition, Mount states that using a pin would require a "resdesign of the leg tube," but a crimp or a dimple would "require an additional manufacturing step." (Doc. 23-4 at 103). However, DJG points out that Mount's report does not show any drawings of a chair that incorporates a pin, crimp, or dimple, nor does it show "any testing of a dimple leg and saddle redesign." (*Id.* at 104). DJG also argues that Mount's report did not include information about the "feasibility or cost of manufacturing a chair with a saddle tip with a crimp, pin, dimple, or barb." (Doc. 23-1 at 10). Moreover, DJG argues that Mount indicated that an "adhesive might have held the device in place," but failed to include any designs or indicate what type of adhesive could be used. (*Id.*). Thus, DJG contends that Landrum has failed to meet his burden of showing that there was a feasible alternative design for the chair.

Additionally, DJG points out that Mount did not show that an alternative design would "increase safety without compromising utility or introducing new risks." (*Id.*). Finally, DJG argues that Landrum is unable to show that his injuries would have been prevented had the chair incorporated Mount's suggestions. Because neither DJG nor Mount can explain why the saddle tip was missing from the chair, DJG reasons that

6

Mount therefore cannot show that the saddle tip would not have been missing had his suggestions, such as a pin or a crimp, been used.

In Landrum's opposition, Landrum reiterates the importance of the saddle plug because it is a "very important structural component of the chair." (Doc. 25 at 8). Landrum argues that because the saddle plug is so important, there should have been a safeguard in place, such as a crimp or a dimple. Additionally, Landrum argues that the "saddle pin, where the saddle plug attaches to the chair, was a smooth cylinder," and there were no "ridges or flared wings or anything that might make it more difficult to extract the plug from the leg tube." (*Id.*). Landrum argues that Mount explained that there are "similar 'barbed hose connections' currently in existence," which would have prevented the tip from coming out of the tube.

Furthermore, Landrum argues that Mount pointed out that the chair leg tubes were "very thin and flimsy," and if the "leg tube wall had been thicker, it could have prevented this accident." (*Id.*). In Mount's report, he noted that a "similar style of folding chair . . . has a thicker wall leg tube," and that the leg tube used in DJG's chair "are not readily available from suppliers." (Doc. 23-5 at 2).

In reply, DJG argues that while Mount criticized the chair and suggested how to improve the chair, Mount failed to present a feasible alternative design that would have prevented Landrum's injuries. DJG also objects to Mount's supplemental report in which Mount opines that there are "so many available alternate designs, providing yet another was considered redundant." (Doc. 25-7 at 2). However, as DJG points out, the supplemental report does not contain any photographs or drawings that incorporate any of his design suggestions for a folding chair. The only photographs that Mount attaches

7

in his supplemental report are of different types of saddle tips. DJG objects to these photographs, arguing that photographs of saddle tips fails to show that one of these saddle tips could have been "incorporated into a chair in a manner that increased safety and was not overly burdensome." (Doc. 28 at 5). DJG argues that Mount failed to show that an alternative design that used one of these saddle tips would have prevented the injury or would meet DJG's or industry standards.

DJG argues that Landrum has failed to show a feasible alternative design, and even if he had, he failed to show that one of these alternative designs would have prevented his injury or that the "risk avoided by such designs outweighed the burden of adopting the designs." *Morgan*, 30 F.3d at 590. DJG reiterates its point that because neither DJG or Landrum know how the saddle plug was removed from the chair, Mount has failed to show that that the saddle plug still would not have been missing had his suggestions been incorporated. Finally, DJG argues that Landrum failed to produce any evidence concerning the "frequency of accidents like the one at issue, or the economic costs occasioned by such accidents, or any studies showing how such accidents would be reduced by his alternative design." (Doc. 28 at 5).

In his supplemental opposition, Landrum argues that while Mount did not provide a "physical prototype of an alternative feasible design," he did reference other chairs that incorporate his design components. Mount explained that a thicker leg tube would have prevented this accident and that other chairs in the industry use thicker tubes. Mount also utilized a Finite Element Analysis ("FEA") technique, which assesses how the chair responds to pressure. (Doc. 23-5 at 3). In his report, Mount explained that if the saddle plug were in position, "the rear chair leg would start to bend," but it would not

fail. (*Id.*) Without the plug, the rear chair leg was compromised. Mount explained in his supplemental report that using FEA is a common method for "'testing' concepts," which is cheaper and more efficient than testing prototypes. (Doc. 25-7 at 2). Additionally, Landrum points out that Mount has maintained that there are thicker leg tubes available and that a thicker leg tube would have prevented this accident. Landrum argues that the photographs of the saddle plugs serve to elaborate on Mount's earlier report that there are alternative designs available for saddle plugs.

In DJG's supplemental reply, DJG argues that Mount admitted that if the saddle tip had been in place, the accident would not have occurred, which makes any argument concerning the thickness and quality of the leg tube irrelevant. (Doc. 34). However, in Mount's deposition, Mount explained that "a slightly thicker tube wall reduces the stresses and reasonably would have prevented the accident." (Doc. 23-4 at 109). Thus, the Court finds that evidence concerning the thickness and the quality of the leg tube is relevant.

The Court further finds that there is a genuine issue of material fact as to whether there was a design defect that precludes summary judgment. There is evidence in the record that the chair leg was not as thick as other legs used in similar folding chairs, and the model used by Landrum's expert indicate that a thicker leg might have prevented the accident. The fact that there are similar folding chairs with a thicker leg is evidence of a feasible alternative design. With respect to the saddle plug, it is undisputed that the saddle plug was missing and neither party knows why it was missing. However, the model indicated that had the saddle plug been in position, the leg would not have failed although the leg still would have started to bend. The Court finds that the saddle plug is

a necessary component to maintain the structural integrity of the chair and the fact that it was missing indicates that a reasonable trier-of-fact could conclude that its absence was due to a design defect. As Mount's initial report indicates, the sample saddle plug was smooth and there was nothing to prevent it from falling out once inserted. The fact that there are other saddle plugs available indicates that a reasonable trier-of-fact could find that a different saddle plug is a feasible alternative design. Thus, the Court denies summary judgment on the issue of whether there was a design defect.

With respect to Landrum's additional argument raised for the first time in his opposition brief that there was a failure to warn, the Court denies this argument for several reasons. First, Landrum never plead this claim in his original or amended complaint. Second, there is no indication in the expert report that a folding chair is the type of product that would warrant a warning. As Landrum noted in his deposition, he had sat in folding chairs before and he did not believe that he needed any type of warning. (Doc. 23-3 at 72). Landrum testified that "[t]here's nothing you should have to watch out for," when sitting in a chair. (*Id.*). There is nothing in the record that would suggest that a warning was necessary.

III.

Accordingly, the Defendant's Motion for Summary Judgment is GRANTED in part and DENIED in part. (Doc. 23).

Signed in Baton Rouge, Louisiana on February 19th, 2013.

**JAMES J. BRADY, DISTRICT JUDGE**
**MIDDLE DISTRICT OF LOUISIANA**